# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:20-cr-347-2 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| JOEL REMBERT, | ) | |
| | ) | |
| DEFENDANT. | ) | |

On June 12, 2020, a criminal complaint was filed charging defendant Joel Rembert ("Rembert") with possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2). (Doc. No. 1 ["Compl."].) On July 1, 2020, an indictment issued charging Rembert, and a second individual, Victor Godette, Jr. ("Godette"), with one count each of possession of a stolen firearm. (Doc. No. 18 ["Ind."].) The indictment alleges that, on June 11, 2020, each man unlawfully possessed a Glock, Model 21, .45 caliber pistol and a Smith & Wesson M&P AR-15, .223 caliber rifle, with knowledge that both weapons were stolen. (*Id.*)

Rembert now moves to suppress evidence seized from a red and black backpack by police on June 11, 2020. (Doc. No. 41 ["Mot."].) The government opposes the motion (Doc. No. 45 ["Opp'n"]), and Rembert has filed a reply. (Doc. No. 46 ["Reply"].) The Court conducted an evidentiary hearing on the motion on October 15, 2020, and, at the conclusion of the hearing, the Court took the matter under advisement and permitted the parties to file supplemental briefs. (*See* Doc. Nos. 52, 55 (Rembert's Supplemental Responses ["Rembert Suppl. I" and "Rembert

Suppl. II", respectively]); Doc. No. 54 (Government's Supplemental Response ["Gov. Suppl."]).) For the reasons that follow, Rembert's motion to suppress is DENIED.

### I. BACKGROUND

On June 11, 2020, Rembert, Godette, and a third individual, Rebecca Milon, were shopping in a Walmart store in Brooklyn, Ohio, when store security stopped Godette on suspicion of shoplifting. After an initial search of Godette's bag produced the upper barrel of a Smith & Wesson assault rifle, store security called the Brooklyn City Police Department ("Brooklyn PD"). Godette was subsequently arrested on weapons charges. Three witnesses testified as to the events that unfolded after Godette's arrest—Rembert, Milon, and Brooklyn PD Patrol Officer James Roach—and these events supply the factual foundation for Rembert's motion.

#### A. Officer Roach's Testimony

Officer Roach, a 26-year veteran of the force, testified that he had extensive experience and training with weapons, both as a member of the Special Weapons and Tactics "SWAT" team and as a weapons instructor. He testified that around 2:00 pm on June 11, 2020, he was dispatched to the Brookpark Road Walmart on a shoplifting complaint. By the time he arrived, two other Brooklyn PD officers were already in the store's loss prevent office processing Godette's arrest. A second search of Godette's bag, incident to arrest, produced a Glock pistol and some magazine cartridges. When asked about the weapons, Godette indicated that he found them in a field. Godette was unable to provide the location of the field, and Officer Roach found his explanation to lack credibility.

While one of the other officers took Godette into custody, Officer Roach secured the

weapons and ammunition. The officers then left the store and congregated momentarily in the parking lot, at which time they were approached by Rembert. Officer Roach's body camera recorded the encounter, and the recording was played at the hearing. (Government Hearing Exhibit ["Gov. Ex."]) A.)

It is clear from the video recording that Rembert did not have any bags on his person as he engaged the officers. Immediately, Officer Roach asked him to put his hands on his head and inquired as to whether Rembert had "anything [on him that the officers] should know about—guns, knives, [or] hand grenades?" At the hearing, Officer Roach testified that he then performed a pat down of Rembert for officer safety "due to the nature of the call," noting that officers had already located a handgun and part of an assault rifle on Rembert's companion. As Officer Roach performed the pat down, Rembert indicated that he had a knife in his pocket. It is unclear from the video whether a knife was located, and Officer Roach did not remember whether he recovered a knife. Having completed the pat down of Rembert, Officer Roach asked him for, and Rembert produced, identification. Officer Roach used his radio to call in the information in Rembert's identification.[1]

As he performed the pat down, Officer Roach asked Rembert what his friend—Godette—was doing walking around a store with part of an assault rifle in his bag. Rembert explained that Godette found the rifle in the street, and he (Rembert) told Godette to throw it away. When Officer Roach shared that he had never heard of a $1,500 assault rifle being left abandoned on a road, Rembert explained that, "It's Ohio [and these things happen], especially if [the weapon is]

---

[1] Rembert also stated that he had a military identification and suggested "that is why I walk around with what I do." Later in the video, Rembert admitted that the military ID actually belonged to his father.

disassembled." Rembert could not say where Godette found the rifle, and he denied any knowledge of the Glock pistol that Godette had in his bag. Rembert suggested to the officers that they should get rid of the weapons, but Officer Roach explained that the guns were evidence and that he could not dispose of them. Officer Roach testified that Rembert was evasive with his answers, and that "he tried to explain everything away." The encounter ended when Officer Roach announced that there was nothing further to be gained by prolonging the discussion. He informed Rembert that his friend was going to go before a judge and that Godette could call him after the arraignment. Rembert walked away from the officers without further discussion or incident.

The officers were preparing to leave the scene when they received information from store security that the red and black backpack that Rembert had on his person in the store was now in the possession of Milon. Officer Roach located Rembert and Milon walking away from the store parking lot, and he decided to investigate further. Officer Roach pulled his cruiser up to Rembert and Milon and exited the vehicle. Once again his body camera recorded the encounter, and the recording was played at the hearing. (Gov. Ex. B.) As he approached the couple, Officer Roach asked Rembert if he could step away "for a second" while he spoke with Milon. Officer Roach directed Milon to the other his side of his vehicle, and Rembert followed, attempting to explain that Milon had "nothing to do with anything." Upon the direction of another officer on scene, Rembert backed up and took several steps out of view of the camera.

Officer Roach then advised Milon that he had received conflicting stories from Rembert and Godette, and that he was hoping that she could help him "figure it out." He asked for her identification and directed her to stand even further away from Rembert. In response to Officer

4

Roach's inquires, Milon explained that she and the two men were friends and had traveled from New York to visit Godette's family in Ohio. She added that Godette was a "new friend" but that Rembert was a "very good friend."

Officer Roach asked if he could check her bags for weapons for his safety and her safety because guns had already been found on one of her friends. She immediately handed him the red and black backpack. Officer Roach asked her who the backpack belonged to and she indicated that it was Rembert's. Officer Roach unzipped the backpack and asked Milon whether there was anything in the backpack that was going to "poke [him], stick [him], or anything like that?" Milon responded by informing the officer that she did not know what was in the bag. Officer Roach then performed a cursory search of the backpack and immediately discovered the handle of a rifle. When he showed it to Milon, she stated that she did not know anything about the weapon. Officer Roach also located a zippered pouch that contained a pistol. He zipped up the backpack and briefly searched Milon's shopping bags and purse.

After he completed his search, he asked Milon to step into his squad car. In response to her inquires, he explained that she was being detained while he completed his investigation. Officer Roach then placed Rembert under arrest. He informed Rembert that the other half of the assault rife and a second weapon was found in the backpack. As the officer placed him in handcuffs, Rembert stated that the backpack was not his. Rembert and Milon were transported to the police station where both individuals were interviewed. At some point during his interview, Rembert admitted that the backpack belonged to him. No charges were ever filed against Milon.

### B. Joel Rembert's Testimony

Rembert also testified at the hearing. He echoed Milon's statement, captured in the video,

5

that the three individuals were from New York and had traveled to Ohio to visit with Godette's family. With respect to the red and black backpack, he testified that the bag was his and that he had actually designed it using an online manufacturer. He stated that he gave the backpack to Milon to hold while he spoke with the officers in the parking lot. He explained that he had a small amount of marijuana in the backpack and he did not want the drugs to be the focus of the discussion. According to Rembert, he did not give Milon permission to access the contents of the backpack, and he expected her to return it to him. On cross-examination, Rembert conceded that he and Milon were close, that they, in fact, lived together, and that he would not have minded if she went into the backpack to get some item that she needed, like a phone charger. He was adamant that he did not know that there were weapons in the backpack.[2] While he testified that he did not remember advising the officers at the scene that the backpack was not his, upon replaying the video in court, Rembert conceded that, in what he characterized as a "scared reaction," he initially disavowed ownership of the backpack.

## II. DISCUSSION

### A. Standing

As an initial matter, the government questions Rembert's standing to challenge the search of the backpack. A defendant has standing to challenge the admission of illegally obtained evidence only if the defendant's own constitutional rights were violated. *United States v. Salvucci*, 448 U.S. 83, 85, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980). A defendant cannot demonstrate standing to challenge a police search unless he can show he had a legitimate

---

[2] When she took the stand, Milon confirmed that the backpack belonged to Rembert, that he did not share the bag with her, that she did not know what was in the bag, and that Rembert did not give her permission to go inside the bag. She also testified that Rembert merely gave her the backpack to hold and that she intended to return it to him.

expectation of privacy in the place or item to be searched; here, the red and black backpack. *Rakas v. Illinois*, 439 U.S. 128, 138–48, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). The burden of proving a reasonable expectation of privacy is on the proponent of the motion to suppress. *Id.* at 130–31. n.1; *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988). To satisfy this burden, a defendant must show both (1) that he subjectively had the expectation and (2) that it is an objectively reasonable expectation that society is prepared to recognize. *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009) (citation omitted).

It is the government's position that Rembert abandoned the backpack when, at the time of his arrest, he denied ownership. "The law is well established that a person who voluntarily abandons property loses any reasonable expectation in the property and is consequently precluded from seeking to suppress evidence seized from the property." *United States v. Ferebee*, 957 F.3d 406, 412 (4th Cir. 2020) (quotation marks and citations omitted); *see United States v. Peters*, 194 F.3d 692 (6th Cir. 1999) ("This and other circuits have recognized that '[o]ne who disclaims any interest in luggage thereby disclaims any concern about whether or not the contents of the luggage remain private.'") (quoting *United States v. Tolbert*, 692 F.2d 1041, 1044 (6th Cir. 1982)).

Relying on *Ferebee*, the government argues that Rembert abandoned the backpack when, upon being told he was under arrest, stated that the bag was not his. (Gov. Suppl. at 306.) In *Ferebee*, the defendant was at the home of a probationer when parole officers entered the home for an unannounced inspection. A backpack was leaning against a sofa upon which the defendant was sitting. When he was asked by the officers to stand up so that they could check for weapons, he handed them the backpack and stated that the backpack was not his. After finding weapons

7

and identification linking defendant to the bag, and upon learning of defendant's prior felony conviction, the defendant was arrested. At the police station, the defendant told officers that the backpack belonged to him. *Ferebee*, 957 F.3d at 410–11.

The Fourth Circuit found that the defendant lacked standing to challenge the search of the backpack because he abandoned it at the scene. The court explained that "the abandonment was complete when Ferebee told [the officer] that the backpack was not his. At that point, Ferebee disassociated himself from the backpack and lost any legitimate expectation of privacy and the 'capacity' to challenge its subsequent treatment." *Id*. at 414. Important to the court's ruling was the fact that "[t]he search took place *after* conduct that the district court reasonably found sufficient to establish abandonment[;]" namely, his denial of ownership of the bag. *Id*. (emphasis in the original).

And therein lies the wrinkle in this case. Here, the backpack was searched *before* Rembert disclaimed ownership of the bag. Prior to the search, Milon advised officers that the bag was Rembert's, and that she did not know what was in the bag. At the hearing, Rembert testified that the backpack was his, and both he and Milon testified that Milon was expected to return it to him. The government invites the Court to assume that Rembert—if given the chance—would have denied ownership before the search. (*See* Gov. Suppl. at 306). Fortunately, the Court need not venture with the government down the path of supposition, nor wrestle with the unusual facts surrounding this particular search because, even if the Court assumes standing, the search of the backpack was reasonable as part of an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1,

88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).[3]

    B.    *Terry* **Stops and Pat Downs**

It is well-established that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry*, 392 U.S. at 30). In determining whether there was reasonable suspicion, courts consider the totality of the circumstances. *Id*. at 8. In addition to authorizing an investigatory stop when there is reason to believe a crime is being committed, *Terry* permits the officer conducting such a stop to perform a limited search of the suspect to determine whether he is armed when the circumstances give rise to a reasonable belief that the individual may have a weapon and thus pose a danger to the officer or others in the immediate vicinity. 392 U.S. at 27, 30–31. The stop and the search are independent actions, and each requires its own justification. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005); *see generally Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

Of course, safety concerns are an integral component of a *Terry* stop. *Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) ("The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to

---

[3] Rembert posits that the government waived any argument that the search was conducted during the course of a *Terry* stop by failing to advance this argument in its initial brief. But it was during the evidentiary hearing that facts supporting an investigative stop came to light, and the Court specifically instructed the parties to address the facts as they were developed during the hearing in their supplemental briefing. The case law relied upon by defendant involved waiver at the next level of review when issues were not raised before the lower court. *See, e.g., United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002). Here, the issue is still an open matter before this Court. Further, Rembert was able to address *Terry* in his motion and second supplement, and, therefore, suffered no prejudice as a result. (Mot. at 238–39; Rembert Suppl. II at 312.) Consequently, the Court finds that the argument was not waived.

protect himself from attack by a hostile suspect."); *United States v. Campbell*, 549 F.3d 365, 372 (6th Cir. 2008). The purpose of a *Terry* frisk for weapons "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable[.]" *Adams*, 407 U.S. at 146. "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Id*. (citing *Terry*, 392 U.S. at 30). "Understandably, the concern of officer safety extends not only to a suspect himself but to 'the area surrounding a suspect' where he might 'gain immediate control of weapons.'" *United States v. Walker*, 615 F.3d 728, 732 (6th Cir. 2010) (quoting *Mich. v. Long*, 463 U.S. 1032, 1049, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)).

Applying these principles to the present case, the Court finds that Officer Roach was justified in conducting an investigatory stop of Milon and performing a limited search for weapons. First, the stop was supported by reasonable suspicion. Officer Roach was aware that illegal weapons had already been located on one of the three individuals shopping together at the Walmart, and that a portion of the assault rifle was still unaccounted for. He also knew that Rembert had knowledge of the rifle but had given an account that conflicted with Godette's version, and that both accounts were dubious. As Officer Roach explained to Milon, because she was friends with and had been traveling and shopping with both men, it was likely that she had knowledge about the weapons. The officer's subsequent inquiries were limited to Milon's identity, the purpose for the trio's trip to Ohio, and the reason weapons were found in her companion's bag. Accordingly, Officer Roach's questioning of Milon was clearly designed to establish her identity and confirm or dispel his suspicions of criminal activity. *See United States*

*v. Young*, 707 F.3d 598, 605–06 (6th Cir. 2012).

A reasonable officer in Officer Roach's position could further reasonably conclude from the circumstances that the bags in Milon's possession might contain unsecured weapons, and that concerns for the safety of the officers and others on scene justified a limited weapons search. Again, Officer Roach knew that weapons had already been located in Godette's bag, and that Rembert had knowledge of at least one of the weapons. He also learned that the red and black backpack Rembert carried with him in the store was now in the possession of Milon, and that Rembert had given the backpack to Milon before he initially approached the officers in the parking lot. Moreover, Officer Roach testified credibly that Milon appeared nervous as he began questioning her, and the video supported his assessment. Based on these circumstances, it was reasonable for Officer Roach to conclude that the backpack might contain additional weapons that would put the officers' safety at risk. Officer Roach was entitled to take "necessary measures" to determine whether the backpack contained any weapons and to "neutralize the threat of physical harm" any concealed weapons would pose to those on the scene. *See Walker*, 615 F.3d at 731 (quoting *Terry*, 392 U.S. at 24.)

It is important to underscore the fact that the officers "by no means had the scene under control or their safety secure" as Officer Roach questioned Milon. *Walker*, 615 F.3d at 734. In *Walker*, the Sixth Circuit noted that the fact that the defendant and his companions were unrestrained and in close proximity to the bags suspected to contain weapons justified a limited search for weapons. *Id*. The Sixth Circuit explained that *Terry* does not require officers to "take unnecessary risks in the performance of their duties[,]" such as returning an unsearched bag suspected of containing weapons to a suspect. *Id*. ("Where, as here, the only alternative is to give

11

a suspect access to a potential weapon (in an un-searched bag), a *Terry* search for weapons is justified—and reasonable."). Similarly here, even after being instructed to step away, Rembert attempted to approach the officers and interfere with Officer Roach's questioning of Milon. Twice, Officer Roach had to move Milon away so that he could question her without disruption from Rembert. "The possibility of access by [Rembert or Milon to any weapons in the bags] was not remote." *Walker*, 615 F.3d at 734. Officer Roach was not required to assume the "unnecessary risk[]" posed by easily accessible weapons while he conducted his investigation. *See id*. at 734 (quoting *Terry*, 392 U.S. at 23.)

Rembert argues that, even if Officer Roach was permitted under *Terry* to pat down the exterior of the backpack, he exceed the scope of a *Terry* frisk for weapons when he unzippered the backpack, looked inside, and removed the zippered bag containing the pistol and looked inside it. He suggests that "this search necessitated that the officer take possession of the back[]pack, and then physically unzip same to begin searching. This is far more intrusive than a simple pat down of a suspect's outer clothing for weapons, as contemplated in *Terry v. Ohio*." (Mot. at 239.) In rejecting a similar argument in *Walker*, the Sixth Circuit noted that "aimlessly grabbing and manipulating the outside of a large bag that may or may not contain the gun—and a loaded gun at that … is not what gun-safety programs recommend." *Walker*, 615 F.3d at 733. Instead, the court found that a limited intrusion into the bag to see if weapons were visible was permitted. *Id*. Similarly here, patting down the outside of the bag would not have been sufficient to confirm or dispel his suspicion that the bag contained weapons. He was further justified in unzipping the inner bag containing the pistol because he testified, based on his experience with weapons, the bag was typically used as a case for handguns. It would not have been reasonable

in the context of a weapons search to fail to look in a container that his training and experience told him likely contained a weapon that could be used against him at the scene. *Walker*, 615 F.3d at 733 (drawing analogy to a vehicle stop and noting that *Terry* permits an officer to open a closed container in car after a stop and after officers have removed the occupants).

The Court concludes that a reasonable officer, based on experience and the totality of the circumstances, could reasonable believe and suspect that the backpack contained a weapon that posed a threat to the safety of the officers and others on the scene. The pat-down and search of the backpack occurred during a legitimate *Terry* encounter which was supported by reasonable suspicion, and the minimally intrusive pat-down and search did not constitute an unreasonable infringement of defendant's privacy interests in the backpack.[4]

### III. CONCLUSION

For the foregoing reasons, defendant's motion to suppress is DENIED in its entirety.

**IT IS SO ORDERED**.

Dated: November 23, 2020

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[4] Because the search was part of a valid *Terry* stop, the Court does not reach the government's alternative argument that Milon had apparent authority to consent to the search of the backpack.